223 P.3d 1165 (2009)
153 Wash.App. 325
STATE of Washington, Respondent,
v.
Judith E. THOMPSON, Appellant.
State of Washington, Respondent,
v.
James L. Thompson, Appellant.
Nos. 61998-5-I, 62048-7-I.
Court of Appeals of Washington, Division 1.
November 23, 2009.
*1166 John Christopher Carver, Christopher Anderson, King County Prosecutor's Office, Seattle, WA, for Respondent.
Oliver Ross Davis, Washington Appellate Project, Seattle, WA, for Appellant, James L. Thompson.
Christopher Gibson, Nielsen Broman & Koch PLLC, Ellen Leslie Arbetter, Attorney at Law, Seattle, WA, for Appellant, Judith E. Thompson.
BECKER, J.
¶ 1 Appellants James and Judith Thompson exploited their relationship with Shirley Crawford, a vulnerable older woman, by stealing virtually all of her money. After the Thompsons were under investigation and were anticipating a hearing on a petition to appoint a guardian for Crawford, they made a videotape of Crawford reading a declaration they had written for her. The declaration stated that she was aware of what they had done and approved of it. In this appeal, the Thompsons challenge the sufficiency of the evidence to support their convictions for witness tampering, and James Thompson appeals his theft conviction. We affirm the convictions. We also grant the State's cross appeal and hold that the court erred in not ordering appellants to pay the $100 DNA collection fee.

WITNESS TAMPERING
¶ 2 The court will uphold a conviction against a claim of insufficient evidence if, taking all evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Bencivenga, 137 Wash.2d 703, 706, 974 P.2d 832 (1999).
*1167 ¶ 3 According to the evidence presented at trial by the State, Shirley Crawford had a fall in 2001 and had to go to the hospital. Crawford, a widow, was over 80 years old. At the time, she lived at home with her only child, Anne Crawford. Anne Crawford was born with severe mental retardation. Crawford had raised, lived with, and cared for Anne for nearly 50 years. As it became clear to Crawford that she would be going into a nursing home instead of returning home right away, she made arrangements for Anne to move in with Jill Campbell, a state caseworker who had worked with Anne when Anne was employed in a supported vocational setting.
¶ 4 In consultation with an attorney, Crawford decided that a power of attorney would be the best way to handle her financial affairs until she got back on her feet. She asked Judith Thompson to assume this role. Crawford had married one of Judith Thompson's relatives and the families had remained close. Crawford and Judith Thompson signed the power of attorney form in August 2001.
¶ 5 In October 2001, Judith Thompson asked Crawford's investment firm, Merrill Lynch, for $8,000 to cover Crawford's nursing home bill. Merrill Lynch approved this request. The check was deposited into Crawford's bank account, over which Judith Thompson had signatory authority.
¶ 6 In November, Judith returned to Merrill Lynch asking for a withdrawal of $9,000 as a gift to herself from Crawford. Merrill Lynch refused and informed her that the power of attorney form did not authorize such gifts. James Thompson made calls to Merrill Lynch, pressuring them to honor Judith's request for gifts.
¶ 7 Judith Thompson did not pay the nursing home bill. The bills began to accumulate. Andrea Fukumoto, a social worker at the nursing home, found Crawford to be confused and embarrassed by the unpaid bills. She helped Crawford contact Merrill Lynch to arrange for direct payments to the nursing home, totalling almost $30,000 during the early months of 2002. Fukumoto began to discuss the possibility of changing Crawford's power of attorney to someone else. Hearing of this, the Thompsons abruptly moved Crawford to a different nursing home. Fukumoto made a referral to Adult Protective Services concerning Judith Thompson's possible financial exploitation of Crawford. The Thompsons, through their attorney, told the investigator they were in the process of setting up special needs trusts for Shirley Crawford and her daughter, Anne. Although suspicious of the Thompsons, the investigator was unable to substantiate a claim against them.
¶ 8 Meanwhile, under pressure and threats from the Thompsons, Jill Campbell resigned as guardian for Anne Crawford. The Thompsons were appointed in her place. They moved Anne to an adult family home, the first time in her life she had ever been in an institutional placement.
¶ 9 In April 2002, Shirley Crawford's attorney went to visit her at the nursing home. After this visit, he received a voice mail from Judith Thompson instructing him not to speak with Crawford without Judith's permission. He sent a letter explaining that he worked for Crawford, not for her.
¶ 10 Four days later, without informing Crawford's attorney, the Thompsons brought Crawford into the office of a notary public and had her sign a second power of attorney form prepared by their own attorney. This new power of attorney added James Thompson as a second attorney-in-fact and included a provision entitling the Thompsons to "reasonable compensation" for their services under the power of attorney. It also authorized the making of gifts:
The Attorney in Fact shall have the power to make gifts, whether outright or in trust, to Judith C. Thompson, James Thompson, and the Trustee of any Irrevocable Special Needs Trust established for the benefit of Anne Crawford (the "Trust") in accordance with any pattern of making gifts to such persons or the Trust which the Principal has established or planned to establish.[1]
¶ 11 In May 2002, six days after Crawford signed the new power of attorney, the *1168 Thompsons used it to transfer $33,500 from Crawford's Merrill Lynch account to Crawford's Federal Credit Union account. They began to transfer that money to themselves in increments.
¶ 12 In November 2002, the Thompsons began efforts to sell Crawford's house. After trying to sell it on their own they accepted the offer of Crawford's neighbor Joy Stewart, a realtor, to list the house. The Thompsons repeatedly reassured Stewart that they were selling the house to put the money "into a trust fund they set up for Shirley so she could live on it for the rest of her life with her daughter." The house sold for $360,000 within three days of being listed. Due to a property line dispute, it took a few months for the sale to close. Within a few days of the closing in February 2003, the Thompsons gifted themselves a total of $309,260 of the house proceeds. The Thompsons used the money to pay off their own vehicle and credit card loans. They also bought a $200,000 boat for their Alaska fishing charter business.
¶ 13 In 2005, a question about Shirley Crawford's Medicaid eligibility led to another investigation by Adult Protective Services. The investigation revealed that the Thompsons had not established any special needs trusts. The Attorney General's office filed a petition for guardianship of Shirley Crawford as well as a petition to remove the Thompsons as guardians for Anne Crawford. A physician examined Shirley Crawford, who was then 87 years old, and reported that she was suffering from moderately severe dementia.
¶ 14 The court scheduled a hearing on the guardianship petition for September 14, 2005. After the hearing, the court appointed a guardian for Shirley Crawford's estate. The guardian found that all that was left in Crawford's accounts was $17.24.
¶ 15 The Thompsons came to the hearing on September 14, 2005 with a videotape of Shirley Crawford that they wanted to present to the court. They indicated that they had made the videotape quite recently and that it demonstrated that Shirley Crawford wanted them to have as a gift the proceeds of the sale of her house. The State obtained this videotape and showed it to the jury at the Thompsons' criminal trial in 2008. The videotape was the foundation for the witness tampering charge against both of the Thompsons.
¶ 16 On the video, Judith and James and other members of the Thompson family are shown gathered in Crawford's nursing home room. Judith Thompson hands a typed statement to Crawford. James Thompson tells Crawford that he wrote it from things that she said. Judith Thompson reads from the statement, which is written in the first person as if Crawford were speaking. It includes statements such as, "I wanted Jim and Judy to have my house." The video shows Crawford nodding and agreeing with the statements.
¶ 17 The Thompsons were tried jointly on charges of theft and witness tampering. Judith Thompson was the sole witness for the defense. She testified that Crawford feared her estate would be wasted on her own medical care instead of providing for Anne and the Thompsons. She said they had gifted Crawford's estate to themselves in order to protect it from would-be thieves and so that Medicaid would pay for Crawford's medical care. She said they needed the gifting power provided by the second power of attorney in order to do "estate planning" for Crawford. She said they spent Crawford's money on their charter business because it was a safer investment than the stock market. She said Crawford agreed with the Thompsons' use of her estate because she knew the Thompsons would care for Anne and her. On cross-examination, she could not explain why they spent the whole estate in about two years without directing any money to Anne. She acknowledged that when she and James made the video, Crawford was willing to agree with whatever anyone said, but she said that Crawford "was very definite about what she thought" when she talked to them.
¶ 18 As set forth in the instructions given by the trial court, the jury was required to find the following elements in order to convict the Thompsons of witness tampering:

*1169 (1) That on or about August 21, 2005, the Defendant attempted to induce a Shirley Crawford to testify falsely; and
(2) That Shirley Crawford was a person the defendant had reason to believe was about to be called as a witness in any official proceedings; and
(3) That the acts occurred in the State of Washington.
¶ 19 The evidence at trial showed that Crawford's mental capacity declined steadily after her fall in 2001. The Thompsons argue that by 2005, her dementia was so advanced that any reasonable person would know she was not competent to testify. They say it was impermissible for the jury to infer that when they made the videotape, they had reason to believe Shirley Crawford "was about to be called as a witness" in an official proceeding.
¶ 20 It is reasonable to infer from the videotape that the Thompsons' objective in making it was to show that as long as Crawford had enough oxygen, she was sufficiently lucid to give a reliable account of her desire to give them the proceeds of her house. Near the end, the videotape shows James Thompson saying to Crawford, "No coercion. You don't mind us video taping, so they can't argue. They can't argue with the video camera."
¶ 21 The State does not argue that the Thompsons actually believed Crawford was competent. There is substantial evidence that they did not. But the statute does not require proof that they believed Crawford was competent to testify according to a technical legal definition of competency. The statute merely requires proof that the Thompsons had reason to believe Crawford would be called as a "witness" in a court proceeding. This requirement was satisfied by evidence that the Thompsons brought the video to the guardianship hearing, and when the court did not review it then, they offered a copy to the investigator for Adult Protective Services.
¶ 22 Appellants argue that Crawford's statements on the video did not satisfy the technical definition of "testimony" because it was not taken under oath as an affidavit, at a deposition or court proceeding. But again, the crime does not require the use of a narrow legal definition of "testify" and it does not require success in inducing false testimony, only the attempt. In other words, the victim does not need to testify under oath for a conviction of witness tampering to be upheld. The Thompsons supplied Crawford with a script and told her it was accurate and that she agreed with it. They told her she needed to retain the statements in the script in case representatives of the State questioned her at a later date. They told her they were going to have to go to court again and hoped the video tape would make a difference in court. They brought family members to watch and sign the purported declaration as witnesses to Crawford's affirmative statements. A reasonable jury could find that the Thompsons believed that, through the videotape, they would be able to present Crawford as a witness at the guardianship hearing, or else use it to impeach her if Crawford ever made contrary statements at some future time.
¶ 23 The videotape shows that the Thompsons attempted to get Crawford to adopt as her own the statements they read to her. The Thompsons argue there was insufficient evidence that the statements were false. But Judith Thompson conceded at trial that some of those statements were inaccurate.[2] For example, one part of the declaration had Crawford express her awareness that $150,000 from the house proceeds had been invested in James Thompson's trucking business to compensate him for losing his previous employment with a trucking company because of all the time he had devoted to taking care of Crawford's affairs. However, the evidence showed that only some $12,000 was arguably related to the trucking business; much more of the house proceeds went to buy the boat. Judith Thompson admitted as much on cross examination.
¶ 24 The declaration has Crawford express that her "mind just wanders a little bit" when she is on oxygen. On the stand, Judith *1170 Thompson admitted that oxygen would not cure or correct Crawford's dementia.
¶ 25 The Thompsons wanted to present Crawford as having given informed consent in 2003 to their appropriation of the money that came from the sale of her house. But given the evidence about Crawford's mental state at that time, that was false testimony; she was incapable of giving informed consent. We conclude there is sufficient evidence of an attempt to induce false testimony.
¶ 26 James Thompson argues that one cannot "induce" false testimony unless one threatens or offers a reward to the witness, citing State v. Rempel, 114 Wash.2d 77, 83-84, 785 P.2d 1134 (1990). We disagree. An express threat or a promise of reward is evidence that may support a charge of witness tampering, but it is not an element of the charge. Rempel stands for the proposition that witness tampering requires a definitive attempt to affect the testimony of a witness, not merely to get someone to drop charges.
¶ 27 The Thompsons assert that the State's evidence was insufficient because it merely pyramided inference on inference. It is true that the State relied on circumstantial evidence to prove the elements of witness tampering, but circumstantial evidence is sufficient so long as the jury is convinced of a defendant's guilt beyond a reasonable doubt. State v. Bencivenga, 137 Wash.2d 703, 711, 974 P.2d 832 (1999).
¶ 28 The evidence supports a determination that the Thompsons videotaped Crawford in a setting where they manipulated her to appear as if she were expressing approval of their scheme. They took a copy to a guardianship hearing to show that Crawford knew and approved of how they were managing her affairs. This was sufficient evidence to support the charge of witness tampering.

THEFT
¶ 29 Appellant James Thompson challenges the sufficiency of the evidence to convict him of first degree theft. The to-convict instruction required the jury to find the following elements:
(1) That during a period of time intervening between on or about November 13, 2001 through on or about February 11, 2005, the defendant wrongfully obtained or exerted unauthorized control over property of another or the value thereof;
(2) That the property exceeded $1500 in value;
(3) That the defendant intended to deprive the other person of the property;
(4) That the defendant's acts were part of a common scheme or plan, a continuing course of conduct, and a continuing criminal impulse; and
(5) That the acts occurred in the State of Washington.
¶ 30 There was evidence sufficient to show James Thompson knew that Crawford suffered from dementia and lacked the capacity to sign the second power of attorney, yet he obtained her signature and then used it intentionally to deprive Crawford of hundreds of thousands of dollars that he knew was supposed to be conserved for her daughter. James Thompson devoted the money to his own purposes instead. His argument amounts to an assertion that the jury should not have believed the State's witnesses. This is not the test. The evidence of theft was sufficient.

DNA COLLECTION FEE
¶ 31 In 2002 the legislature enacted a statute requiring courts to impose a $100 DNA collection fee with every sentence imposed under chapter 9.94A RCW for certain specified crimes, "unless the court finds that imposing the fee would result in undue hardship on the offender." Former RCW 43.43.7541 (2002).
¶ 32 In 2008 the legislature passed an amendment to make the fee mandatory regardless of hardship. The current version simply states that "Every sentence ... must include a fee of one hundred dollars." RCW 43.43.7541.
¶ 33 The amendment took effect June 12, 2008. The Thompsons were convicted by the jury on May 14, 2008. They were sentenced on July 17, 2008. The trial court denied the *1171 State's request to impose the $100 fee, expressing concern about ex post facto implications. In a cross-appeal, the State contends the court erred by denying the request to impose the $100 fee.
¶ 34 The State's cross-appeal is well taken. We recently addressed the 2008 amendment in State v. Brewster, 152 Wash.App. 856, 218 P.3d 249 (2009). Brewster, like the Thompsons, committed her offense before the 2008 amendment went into effect. She argued that application of the new statute to her was barred by the saving statute, RCW 10.01.040. Under the saving statute, criminal cases generally must be prosecuted and decided according to the law in effect at the time of the offense.
¶ 35 But the saving statute applies only to criminal and penal statutes. We held the saving statute did not apply in Brewster's case because the DNA fee is not punitive. Therefore, she was subject to the newer version of the statute in which the imposition of the fee is mandatory, not discretionary. Following Brewster, we reject the Thompsons' reliance on RCW 10.01.040 as a basis for avoiding application of the 2008 amendment.
¶ 36 We similarly hold that the state and federal constitutional prohibitions against ex post facto laws are not a basis for avoiding the application of the 2008 amendment. Like the savings statute, the ex post facto clauses of the federal and state constitutions apply only to punitive laws, State v. Ward, 123 Wash.2d 488, 496, 869 P.2d 1062 (1994), and the DNA fee is not punitive.
¶ 37 The Thompsons also rely on a statute that was not addressed in Brewster, RCW 9.94A.345. That statute states: "Any sentence imposed under this chapter shall be determined in accordance with the law in effect when the current offense was committed." We reject this argument as well.
¶ 38 Defendants invoked RCW 9.94A.345 in State v. Pillatos, 159 Wash.2d 459, 473, 150 P.3d 1130 (2007), as a basis for arguing against application of a new statutory procedure for determining exceptional sentences to defendants whose offenses were committed before the enactment of the new statute. The court found that the purpose of RCW 9.94A.345 was to "make clear that defendants had no vested rights in prior, more lenient, offender score calculation statutes. In this case, both past and present law allows for exceptional sentencing." Pillatos, 159 Wash.2d at 472-73, 150 P.3d 1130. The court concluded that because the law had long included the possibility of exceptional sentences, application of the change in procedure did not violate the letter or purpose of RCW 9.94A.345.
¶ 39 That rationale in Pillatos applies here. Since 2002 the law has required trial courts to assess a $100 DNA collection fee. The amendment does not change that amount; it only removes the trial court's discretion to make a finding of undue hardship that will permit waiver of the fee. The defendants do not have a vested right in the statute as it was enacted in 2002.
¶ 40 Our conclusion in this regard is not inconsistent with State v. Humphrey, 139 Wash.2d 53, 983 P.2d 1118 (1999), the case principally relied upon by appellants. At issue in Humphrey was a statutory increase in the amount of the victim penalty assessment. The court began with the general presumption that statutes apply prospectively, "unless there is some legislative indication to the contrary." Humphrey, 139 Wash.2d at 57, 983 P.2d 1118. Finding no clear legislative identification of a precipitating event for application of the statute, the court determined that the amendment could not be applied to offenses committed before its enactment.
¶ 41 Here, unlike in Humphrey, the 2008 statute making the fee mandatory contains a clear legislative indication of how its terms are to be applied. It states, "Every sentence imposed under chapter 9.94A RCW for a crime specified in RCW 43.43.754 must include a fee of one hundred dollars." RCW 43.43.7541 (emphasis added). We find the phrase "every sentence" to be an unambiguous indication that sentencing is the precipitating event for imposition of the mandatory fee required by RCW 43.43.7541. The fact that the legislature used different language in RCW 43.43.754(6) to define the categories of persons who are subject to the provisions *1172 of RCW 43.43.754(1)-(5) for collection of biological samples does not have any bearing on the mandatory fee issue.
¶ 42 We conclude the 2008 amendment must be applied to the Thompsons. The judgment and sentence is remanded to the trial court to impose the $100 DNA collection fee upon each of them.
¶ 43 The convictions are affirmed.
WE CONCUR: ELLINGTON and COX, JJ.
NOTES
[1] State's Exhibit 2 at 4.
[2] Report of Proceedings (May 12, 2008) at 43-44, 66-67.