# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

<table>
<tr><td>STATE OF WASHINGTON,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>No. 68937-1-I</td></tr>
<tr><td>Respondent,</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td>DIVISION ONE</td></tr>
<tr><td>v.</td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>SYLVIA C. KNOPP,</td><td>)</td><td>UNPUBLISHED OPINION</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>Respondent.</td><td>)</td><td>FILED: February 18, 2014</td></tr>
</table>

SPEARMAN, A.C.J. — Sylvia Knopp was convicted of theft in the first degree for making repeated withdrawals of cash from the bank account of her mother, Maria Volz, while she had durable power of attorney for Volz. On appeal, she claims (1) the evidence was insufficient to support her conviction, (2) the prosecutor committed misconduct during closing argument through a number of remarks, and (3) defense counsel was ineffective in failing to object to the prosecutor's remarks. We conclude the circumstantial evidence was sufficient to support Knopp's conviction where it showed that she spent the money she withdrew on gambling. We also conclude that, while the prosecutor misstated the law regarding Knopp's good-faith claim of title defense, Knopp does not show that the statements were so ill intentioned and flagrant that an instruction could not have cured any prejudice. Thus, her prosecutorial misconduct claim is waived. Finally, Knopp does not establish either deficient performance or prejudice for her ineffective assistance claim. We affirm.

## FACTS

In 2008 and 2009, Sylvia Knopp worked full-time at a casino, where she earned $10.71 an hour plus tips. As of October 2009, she had grossed $21,462.95 in wages and tips for 2009. She frequently had a low or negative balance in her bank accounts, and from January 2009 to August 2009 was charged overdraft fees over thirty times. Nonetheless, she visited casinos several times a month, wagering a handle of hundreds, sometimes thousands, of dollars during many of her visits.[1] At the Point Casino, for example, Knopp lost over $4,000 from December 2008 through October 2009, wagering more than $40,000 during that time.

Since December 2006, Knopp had durable power of attorney with respect to the health care decisions and finances of her elderly mother, Maria Volz. The durable power of attorney authorized Knopp to:

> advance all reasonable and desirable expenses in the exercise of the responsibilities within this power of attorney and, further, to reimburse the attorney-in-fact for reasonable and desirable expenses advanced by such attorney-in-fact. The attorney-in-fact is further authorized and encouraged, when said attorney-in-fact deems it desirable or necessary, to employ others to aid in the management of the principal's assets and person including, but not be limited to, lawyers, accountants, physicians, nurses, and other medical paramedical personnel.

Exhibit (Ex.) 1. The durable power of attorney required Knopp "to account to any subsequently appointed guardian or personal representative" for Volz. Id.

---

[1] The "handle" is the total amount wagered over the course of the day, including wagering money previously won. Accordingly, a player's handle can be in excess of the amount of money the player brought to the casino.

Volz suffered an injury in December 2008 and was admitted to Providence Mt. St. Vincent for rehabilitation on December 26. Her health insurance ended its coverage for her sub-acute care effective January 11, 2009. Her needs, however, required that she remain in twenty-four hour residential care. When Knopp advised the staff at Providence that she wanted to move Volz to a different facility, the staff worked with her to apply for Medicaid benefits on Volz's behalf to enable her transfer. Knopp initiated a Medicaid application but did not complete it. Knopp admitted she was aware that if the Medicaid application was accepted, most of Volz's income would be required to pay for her medical needs. In May 2009, Knopp moved Volz to an assisted living facility, Park Vista. The move was against medical advice because the services offered by Park Vista were inadequate to meet Volz's needs.

During her hospitalization, Volz was not in full possession of her mental faculties. Henry Judson, a guardian ad litem, visited Volz at Providence in April 2009 and noted that she did not understand why she was there and was unable to provide her address or any information about her finances. An evaluator who met with Volz in August 2009 concluded that she suffered from dementia and lacked the capacity to manage her financial affairs.

Between December 2008 and October 2009, Knopp withdrew $16,550 in cash from Volz's checking account. She withdrew another $6,500 via debit card for, among other things, expenditures at stores, restaurants, and gas stations. She also obtained $1,900 as cash back when she made deposits of checks into Volz's accounts. The total amount of Knopp's withdrawals was nearly identical to

the amount of the deposits that Volz received from her pension and social security.

During this time, Knopp did not pay the majority of Volz's medical bills, housing bills, or the property taxes or insurance on Volz's home.[2] Instead, her cash withdrawals closely tracked her gambling activities. For example, on January 25, 2009, Knopp gambled at the Point Casino, losing only $2.63, but with a total handle of $1,606.35. That day, she made four cash withdrawals totaling $300 from Volz's checking account at a Point Casino ATM. She also withdrew $100 from the Point Casino ATM the day before and the day after that visit. Similarly, on February 1, 2009, Knopp gambled at the Point Casino, losing $159.96 with a handle of $548.75. That day, she withdrew $100 from Volz's account at a Point Casino ATM. Also that day, she withdrew $180 from Volz's account at a non-casino ATM, and another $900 the next day from a non-casino ATM. Of the $16,550 in cash Knopp withdrew from Volz's accounts, $6,095 was withdrawn at casinos, and another $3,564 was withdrawn at non-casino ATMs within one day of her gambling at a casino.[3]

By March 2009, Knopp's use of Volz's money was being investigated by Adult Protective Services and the Seattle Police Department. In May 2009, a guardianship petition was filed and Judson was appointed Volz's guardian ad litem. Judson met with Knopp and requested an accounting, but she did not

---

[2] Knopp paid approximately $4,000 of Volz's Park Vista bills, but as of October 2009, Park Vista was still owed over $18,000.

[3] These amounts include ATM fees.

4

provide one. She also did not provide an accounting to Adult Protective Services, the police, or the court after it ordered her to do so.

In June 2009, Hudson obtained a court order prohibiting Knopp from accessing Volz's accounts. The bank failed to process the order correctly and Knopp was able to continue withdrawing money. Knopp withdrew several thousand dollars in cash from Volz's accounts from June 19 through August 3. On August 4, 2009, a court order was entered permitting Knopp to pay an insurance premium for Volz, but the order required such payment to be made by check and forbade Knopp from making cash withdrawals. Nonetheless, Knopp withdrew over $2,400 from Volz's account from the time the order was entered until her power of attorney was terminated in October 2009. Moreover, Knopp directed that Volz's pension and social security checks, which had been deposited into Volz's accounts via direct deposit, be mailed to Knopp's post office box instead. This allowed her to access these funds without utilizing Volz's blocked bank accounts.

On June 23, 2011, the State charged Knopp with one count of theft in the first degree, alleging two aggravating factors: (1) the victim was particularly vulnerable and (2) Knopp used a position of trust to facilitate commission of the offense.[4] At trial, Knopp testified that she used the cash she withdrew from Volz's accounts to, among other things, pay Volz's bills, give Volz spending money, and pay herself for services rendered for Volz. She claimed she withdrew cash to obtain money orders to pay Volz's bills because it was easier that way. Knopp

---

[4] The State later amended the information to clarify that the theft was based on a series of transactions.

5

argued the State failed to prove she did not spend the money on Volz. She requested, and the court gave, jury instructions on the defense of good-faith claim of title.

The jury found Knopp guilty and also found that both aggravating factors were present. The sentencing court imposed a standard-range sentence. Knopp appeals.

## DISCUSSION

### Sufficiency of the Evidence

Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Hosier, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). A claim of insufficiency of the evidence admits the truth of the State's evidence and all inferences that can reasonably be drawn from the evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence is no less reliable than direct evidence. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980) (citing State v. Gosby, 85 Wn.2d 758, 539 P.2d 680 (1975)).

To convict Knopp of theft in the first degree as charged in this case, the jury instructions required the State to prove beyond a reasonable doubt that she exerted unauthorized control over more than $5,000 of Volz's money with the intent to deprive Volz of it.[5] To "exert unauthorized control" means to take the property of another or, when one already has control over the property through

_____

[5] The jury instructions were consistent with RCW 9A.56.020(1)(a) and RCW 9A.56.030(1)(a).

6

power of attorney, to secrete, withhold, or appropriate the property to one's own use or to the use of any person other than the true owner.[6] Clerk's Papers (CP) at 53.

Knopp first contends the evidence failed to show she appropriated the money she withdrew from Volz's accounts to her own use rather than using it for Volz's benefit because there is no evidence of where the money went. We disagree. There was no direct evidence to show how Knopp spent the cash. However, substantial circumstantial evidence supports the State's theory that she spent the cash on gambling, rather than for Volz's care. The evidence showed that Knopp withdrew over $16,000 in cash from Volz's accounts at a time when Volz was incapable of overseeing her finances. The evidence showed that, during that period, Knopp was struggling financially but was gambling frequently at the same casinos where she withdrew much of the cash. The evidence showed that Knopp, as Volz's attorney-in-fact, did not pay the majority of Volz's medical bills, housing bills, or her property taxes and insurance. Moreover, Knopp's testimony did not explain why she made multiple withdrawals from casino ATMs on the same day, even though an ATM fee was charged with each withdrawal, which is consistent with the State's theory that she withdrew the cash to compulsively gamble. Ex. 7, 32, 35. In sum, the evidence permitted a rational trier of fact to infer that Knopp exerted unauthorized control over at least $5,000 of Volz's money.

---

[6] The definition of "unauthorized control" in the jury instructions was consistent with RCW 9A.56.010(22).

7

Knopp cites State v. Thompson, 153 Wn. App. 325, 223 P.3d 1165 (2009) and State v. Crowder, 103 Wn. App. 20, 11 P.3d 828 (2000), suggesting that the State must show precisely how she spent the cash. But these cases do not support this proposition. Rather, as the State contends, they simply illustrate circumstances in which there is sufficient evidence of theft.[7] In neither case did this court hold that it was necessary for the State to show how exactly a defendant spent money appropriated from the victim to prove that the money was appropriated to the defendant's own use.

Knopp next contends that even if her use of the money was not actually authorized, the State failed to disprove her good-faith claim of title defense. It is a defense to a charge of theft that the property was taken "openly and avowedly under a claim of title made in good faith, even though the claim be untenable." RCW 9A.56.020(2)(a). The defense negates the essential element of intent to deprive, so the State bears the burden of proving the absence of the defense beyond a reasonable doubt. State v. Ager, 128 Wn.2d 85, 92, 904 P.2d 715 (1995); State v. Hicks, 102 Wn.2d 182, 187, 683 P.2d 186 (1984).

Knopp contends the State provided no evidence the money was spent on anything other than expenses she believed to be reasonable and desirable to effectuate Volz's care under the durable power of attorney. We conclude the

---

[7] See Thompson, 153 Wn. App. at 329-36 (evidence sufficient to support theft conviction where defendant knew victim suffered from dementia and lacked capacity to sign power of attorney permitting gifts of money from victim to defendant; defendant nonetheless obtained victim's signature; and defendant gifted himself money from victim's bank account and from sale of victim's home, using part of money to pay off loans and buy a boat); Crowder, 103 Wn. App. at 23-29 (evidence sufficient to support theft conviction where defendant with power of attorney transferred money from victim's account to her own but was not authorized to make gifts of victim's property; and where defendant, after power of attorney was revoked, persuaded victim to quitclaim property to her in violation of court order).

8

State disproved the defense beyond a reasonable doubt. The power of attorney authorized Knopp to reimburse herself for "reasonable and desirable expenses" advanced by Knopp. But, as we have explained, the State presented circumstantial evidence that Knopp spent the cash she withdrew on gambling rather than on Volz's care. The State's evidence showed, furthermore, that Knopp's testimony regarding why she paid herself the cash was not credible and that her claim of title to the money was not made in good faith. Knopp testified, for example, that she paid herself for work done for Volz, such as shampooing rugs, pressure washing the roof, doing yard work, and performing maintenance at Volz's home. But the accounting she provided at trial did not reflect such work, and the guardian ad litem reported that in September 2009, Volz's home was dilapidated and disheveled, the carpet reeked of pet urine and feces, and the yard was in disrepair. Moreover, of the dozen or so receipts that Knopp provided to show how she spent cash for Volz, some were incomplete, illegible, or not clearly related to expenses for Volz. But even assuming all of the receipts were for expenses for Volz, they totaled approximately $3,200, leaving approximately $12,000 of unexplained cash withdrawals. Also, Knopp's assertion that she used money to buy money orders to pay Volz's bills because doing so was easier lacked credibility, where there was evidence that she could have used Volz's debit card or checkbook and evidence that Knopp herself used debit cards and checks to make payments from her own account. Knopp testified regarding how she used the money and why she felt she was entitled to the money, and the jury was entitled to disbelieve her testimony. We do not review credibility

9

determinations on appeal. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Moreover, Knopp's withdrawals from Volz's account in contravention of a court order belied her claim that she was acting in good faith.

## Prosecutorial Misconduct

In a prosecutorial misconduct claim, the defendant bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012) (citing State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011)). Once a defendant establishes that a prosecutor's statements are improper, this court determines whether the defendant was prejudiced under one of two standards of review. Id. at 760. If the defendant objected at trial, he must show that the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. Id. (citation omitted). If the defendant did not object, he is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Id. at 760-61(citing State v. Stenson, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997)). In that case, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. Id. (citing Thorgerson, 172 Wn.2d at 445)).

A prosecutor's argument to the jury must be confined to the law stated in the jury instructions. State v. Walker, 164 Wn. App. 724, 736, 265 P.3d 191 (2011) rev. denied, 177 Wn.2d 1026, 309 P.3d 504 (2013)). A prosecutor's

misstatement of the law can constitute improper argument. See Emery, 174

Wn.2d at 759-60 (arguments shifting burden of proof to defendant are

misconduct). Arguments alleged to be improper should be reviewed in context of

the total argument, the issues in the case, the evidence addressed in the

argument, and the court's jury instructions. State v. Russell, 125 Wn.2d 24, 85-

86, 882 P.2d 747 (1994).

Knopp claims the prosecutor committed prosecutorial misconduct during

closing argument by misstating the law pertaining to her good-faith claim of title

defense. First, she points to the emphasized statements within the following

argument:

> And the defendant, Sylvia Knopp, agreed to [handle Volz's health care and financial decisions] as she got older and incapacitated. She agreed to assume that weighty responsibility of making the decisions for another person's life.
>
> It's not an insignificant thing to agree to do something like that, to take care of another person who's unable to care for themselves is an onerous responsibility. And it's one the defendant didn't have to do. But she decided to do that and she agreed to do that.
>
> And because caring for another person is such a serious matter, we as a society decided to make it a crime not to fulfill that duty when we have accepted that duty. So if we have a child, and we neglect that child, it's criminal. If we adopt a child and we decide we really don't want the child after all, and we abandon that child, it's criminal.
>
> And if we assume a fiduciary duty to take care of someone who's vulnerable and can't make decisions for themselves and abandon that duty, we as a society have decided that's criminal. And what we know in this case is that the defendant stole money from her mother, Maria Volz.
>
> We know that beginning in December of 2008 and continuing on throughout October of 2009, she was the power of attorney for her mother. And she used that power of attorney again and again and again to take cash out and to make purchases that were for herself and not for her mother's benefit.

> She chose again and again not to take care of her mother, but to fulfill her greed.

(Emphasis added.) RP at 1014-16. Knopp also points to the prosecutor's later statement, "With each cash withdrawal that she made, each ATM visit that she made, the defendant chose to fulfill her greed, rather than to fulfill her fiduciary duty towards her mother. And that is not just immoral. It's criminal." RP at 1047.

We conclude that, in the context of the prosecutor's larger argument, the statements did not misstate the law. The State correctly concedes that the failure to fulfill a fiduciary does not necessarily rise to the level of a crime.[8] And the statements emphasized by Knopp, in isolation, were incorrect to the extent they suggested the jury could convict if it found that Knopp merely breached a fiduciary duty to Volz. But in the context of the surrounding statements, the statements were not improper. The prosecutor described the burden imposed by a fiduciary responsibility, noted that Knopp had accepted that burden, and accused her of stealing money from Volz. The argument as a whole emphasized that it was Knopp's actions of stealing money and using it for herself, not merely a failure to fulfill a fiduciary duty that made her guilty of theft.

Knopp next points to the emphasized statements in the following argument by the prosecutor:

> So starting on December 30th, the withdrawals for cash at the casinos begins.

---

[8] Conviction for theft requires proof of intent to deprive. RCW 9A.56.020. But a person can violate a fiduciary duty without criminal intent. See 29 David K. DeWolf, WASHINGTON PRACTICE: ELEMENTS OF AN ACTION§ 12:1, at 349-50 (2013) (essential elements to breach of fiduciary duty cause of action are (1) the existence of a fiduciary relationship giving rise to a duty of care on the part of the defendant to the plaintiff; (2) an act or omission by the fiduciary in breach of the standard of care; (3) the plaintiff sustained damages; and (4) the damages were proximately caused by the fiduciary's breach of the standard of care).

> And I just want to stop for a minute and talk about this casino thing. You have heard exhaustively about casino withdrawals. <u>It doesn't matter where the defendant was spending this money.</u> It doesn't matter if she was gambling her mother's money away, or spending it on her hobbies, whatever they might have been. <u>What matters is she was withdrawing cash from her mother's account without authority.</u> And the fact that we can show these withdrawals were made at casinos is circumstantial evidence that she's not spending that money on her mother's behalf. But it really isn't the point here. The point is, the defendant was withdrawing cash repeatedly and using it not for her mother's benefit, but for herself.

(Emphasis added.) RP at 1018.

The prosecutor's remarks as a whole did not misstate the law. While Knopp is correct that she did not commit theft if she used the money for Volz's benefit, in context, the statements were part of the State's proper argument that it did not need to prove how Knopp spent Volz's money (for example, on gambling or on her other hobbies), as long as it proved she withdrew the money without authority and did not spend it on Volz's behalf.

Knopp also contends the prosecutor committed misconduct through the emphasized statements in the argument below:

> And here's the evidence that we have that the defendant secreted this money and appropriated it for her own use. First of all, again, we know she withdrew over $15,000 in cash from Maria's accounts.
> She has claimed to you on the stand that this money was owed to her. She told you she's paid herself for visiting her mother. She told you she paid herself for being interviewed by Adult Protective Services and the police regarding her exploitation of her mother. She told you that she paid herself to fight the guardianship that was filed because she had financially exploited her mother. She told you she paid herself for parking, gas, time in court, all for fighting this guardianship.
> And that, she told you, is where some of the cash from those withdrawals went to. <u>So it's up to you, ladies and gentlemen, to decide whether that's a legitimate explanation for this money. Is the</u>

> defendant entitled to pay herself before she pays her money, [sic] or before she pays for her mother's care?

> . . .

> And maybe, maybe if there's any money left over after you paid all of her necessary expenses, you could pay yourself for items or things that you could hire out for. That's what the defendant testified she had authority to do. That's what she said the attorney Karl Flaccus said she could do, is pay herself for things she could hire out for.

> So if you had money left over, and you needed – your mother's lawn needed to be mowed, and you wanted to mow it yourself, arguably you could pay yourself to mow your mother's lawn if you were inclined to do that. But certainly, you could not pay yourself for the things that the defendant paid herself for. No reasonable person would pay themselves to visit their mother. No reasonable person would pay themselves to be interviewed by APS and Seattle Police about their own exploitation of their mother. No reasonable person would pay themselves to fight the guardianship that was filed as a result of their exploitation of their mother. It simply is not reasonable. And it simply isn't acceptable.

(Emphasis added.) RP at 1029-30; 1044-45.

Knopp argues that, even if her priority of Volz's expenses was not "reasonable or desirable" under the power of attorney, she did not necessarily commit theft. She notes that Judson, an elder law attorney, testified that power of attorney laws do not provide a clear rule for prioritizing some of the principal's expenses over others.

We again conclude that, in the context of the prosecutor's larger argument, the statements were not improper. The statements were part of the prosecutor's argument discussing the element of theft that Knopp appropriated Volz's funds for her own use, i.e., whether the State met its burden of proof to show that Knopp exerted unauthorized control over Volz's money. The prosecutor's argument was that some of Knopp's assertions regarding how she spent the money—to pay herself for visiting her mother, for time and expenses in

fighting the guardianship, etc.—were not reasonable or credible, that those activities were not authorized under the durable power of attorney, and thus that she exercised unauthorized control over Volz's money. As a whole, the argument did not misstate the law.

Finally, Knopp contends the prosecutor misstated the law regarding the good-faith claim of title defense when she argued as follows:

> This [good-faith claim of title defense] is often used when people take a car, because they believe it belongs to them. When they think property is actually theirs, and when they in good faith take that property thinking that it's theirs.
> In this case, the defendant is going to argue to you that this is basically a good faith claim of entitlement. Not that it's a good faith claim of title. In other words, the truth is that the defendant did not ever believe that this was her money. She may have believed she was entitled to it because of the work she allegedly did for her mom, but she never believed this money was actually hers to start with.
> She testified she knew it was her mother's income. She knew it was her mom's Social Security and her pension. So I would argue to you that this instruction should not apply here. In other words, the defendant had no good faith basis to believe this money was actually hers.
> And I would urge you not to confuse good faith claim of title with good faith claim of entitlement. In other words, it's not okay to do something for someone and decide that you're owed money and then steal that money from them, because you think they are supposed to pay you for something. That's not how we work in this society. If you have a claim, and you are believed you are owed money, and that person is not going to pay you, then you need to deal with that in some other way than stealing it from that person or taking it from that person. So I would argue to you that this is not a case of good faith claim of title.
> The defendant never really believed this money was hers to start with. She does believe it's hers, that she's entitled to it apparently. But that's very different. She knows full well this is her mother's money. And the dispute in her mind is whether or not she is entitled to [Volz's money] before the nursing homes or her mother's other bills, her other financial interests are entitled to that money.

> The defendant knew the money was [Volz's], as I said. She knew her mother was getting these checks into her mother's bank account. And she also knew it was her duty to pay her mother's nursing home bills first and foremost as power of attorney. She testified to that. She told you she knew what a fiduciary duty was. And she knew she had a duty to pay her mother's nursing home bills. And she knew her mother would be evicted for nonpayment of those bills. And you heard Henry Judson testify about the duty of a power of attorney. And it's obvious to all of us, it's your duty as a power of attorney to take care of this person who can no longer take care of themselves. And of course, the most fundamental thing you need to take care of is their health care and their physical care if they are unable to care for themselves.
>
> So it goes without saying the defendant knew it was in her duty. It was her duty to act in her mother's best interest and to pay her nursing home bills before she paid herself. So even if she believed this money was actually hers, and not her mother's, she still did not do the right thing with that money. So it's not a legitimate defense.

RP at 1036-38.

We agree with Knopp that this argument misstated the law regarding the defense as it applied to this case. It is a defense to a charge of theft that property was taken "openly and avowedly under a claim of title made in good faith, even though the claim be untenable." RCW 9A.56.020(2)(a). The defense "negates the element of intent to steal by providing that a defendant cannot be guilty of theft if the defendant takes property from another 'under the good faith belief that he is the owner, or entitled to possession, of the property.'" Ager, 128 Wn.2d at 92 (quoting Hicks, 102 Wn.2d at 184). Here, Knopp asserted title to the money under the durable power of attorney, which authorized her to "advance all reasonable and desirable expenses in the exercise of the responsibilities within this power of attorney and, further, to reimburse the attorney-in-fact for reasonable and desirable expenses advanced by such attorney-in-fact." Ex. 1.

16

On appeal, the State concedes that Knopp was entitled to present the good-faith claim of title defense based on the durable power of attorney but argues, inconsistently, that the defense is available only when a defendant is attempting to recover specific, tangible property and is not available unless a defendant believes property is his or hers to begin with. We disagree. RCW 9A.56.020(2)(a) does not contain either requirement. Nor do the cases cited by the State support the proposition that the defense was not available in this case.[9] Knopp was not using the type of self-help used in those cases. Rather, her defense was that she was entitled under the power of attorney to pay herself, and the power of attorney did permit her to reimburse herself for reasonable and desirable expenses. The prosecutor's remarks incorrectly told the jury that Knopp could not use the defense unless she believed the money was hers to begin with.

Nonetheless, we conclude that Knopp waived any claim of prosecutorial misconduct by failing to object. The prosecutor's statements were not flagrant and ill intentioned. As the State points out, the law regarding the applicability of the good-faith claim of title defense to the circumstances in this case is not

---

[9] See State v. Self, 42 Wn. App. 654, 713 P.2d 142 (1986) (no entitlement to jury instruction on good-faith claim of title defense where defendant, on behalf of victim's employee, robbed victim of cash, wallet, car keys, and credit cards, claiming employee was owed payment by victim; defense not available in cases where force is used to collect debt and where defendant has no claim of ownership in specific property acquired); State v. Brown, 36 Wn. App. 549, 676 P.2d 525 (1984) (no entitlement to instruction on good-faith claim of title defense in case of first-degree burglary where defendants invaded victim's home and took stereo to secure return of purse and gun allegedly taken by victim from one defendant earlier that day; defendants did not claim, and there was no evidence to show stereo belonged to defendants); State v. Larsen, 23 Wn. App. 218, 596 P.2d 1089 (1979) (in case where defendant whose wife had performed sex acts for money threatened client with firearm and forced client to write new check after he stopped payment on original check, trial court did not err in instructing jury that a creditor's intent to collect a debt from his debtor by use or threatened use of immediate force, violence or fear of injury is not a defense to robbery; good-faith claim of title defense is not allowed where a defendant uses force to collect a debt with no claim of ownership in the specific property acquired).

17

entirely clear; there is little to no case law regarding the defense as it applies to power of attorney cases. We also conclude that any prejudice could have been cured by an instruction. Additional instructions from the trial court could have informed the jury that the good-faith claim of title defense did not require that Knopp believed the money was hers to begin with.

## Ineffective Assistance of Counsel

We review claims of ineffective assistance of counsel de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). A defendant claiming ineffective assistance bears the burden of demonstrating that (1) counsel's performance was so deficient that he was not functioning as the "counsel" guaranteed by the Sixth Amendment and (2) the defendant was prejudiced by counsel's deficient performance, such that the defendant was deprived of a fair trial. State v. Cienfuegos, 144 Wn.2d 222, 226-27, 25 P.3d 1011 (2001) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Counsel is deficient if his "representation fell below an objective standard of reasonableness based on consideration of all of the circumstances." State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). Scrutiny of counsel's performance is highly deferential, and courts presume that counsel's representation was effective. Id. Prejudice results when it is reasonably probable that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (quoting Strickland, 466 U.S. at 694).

Knopp contends that, even if her prosecutorial misconduct claim was not preserved for appeal, she was denied her constitutional right to effective

assistance of counsel because her attorney failed to object to the prosecutor's various remarks. We conclude that Knopp does not demonstrate deficient performance or prejudice. First, as we have explained, the law regarding the applicability of the good-faith claim of title defense to these circumstances is not entirely clear. Thus, Knopp cannot show that defense counsel should have known that the prosecutor incorrectly stated the law. Second, Knopp fails to show prejudice. Where the circumstantial evidence was overwhelming that Knopp spent at least $5,000 of the cash she withdrew for gambling, she does not show with reasonable probability that the result of the trial would have been different had defense counsel objected to the prosecutor's remarks.

Affirmed.

WE CONCUR:

19