IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36851-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JOYCE ASPEN HOFFMAN, | ) | OPINION PUBLISHED IN PART |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — In 2020, the Washington Legislature substantially modified the

punishment for the crime of bail jumping with the result that for most criminal

defendants, their first failure to appear at a pretrial hearing need not be a crime, and their

second will be a gross misdemeanor. Joyce Hoffman, whose convictions in 2019

included two counts of bail jumping, asks us to apply the legislation retroactively to her.

Whether legislation that ameliorates punishment for a crime is an exception to the

Washington saving statute[1] is an issue presently pending before the Washington Supreme

Court. *See State v. Jenks*, 12 Wn. App. 2d 588, 459 P.3d 389 (2020), *review granted*, 196

Wn.2d 1001 (2020). Unlike the pure mitigation of penalty at issue in that case, however,

the legislation on which Ms. Hoffman relies modified the elements of the crime, meaning

that defendants would not only need to be resentenced, but could need a second minitrial.

---

[1] RCW 10.01.040.

In the published portion of this opinion we hold that controlling case law rejects any exception to the saving statute that would require second trials.

In the unpublished portion of the opinion, we agree with Ms. Hoffman that her convictions for possession of a controlled substance and use of drug paraphernalia require reversal and remand.

We reverse Ms. Hoffman's convictions for possession of a controlled substance and use of drug paraphernalia and remand. Her convictions for bail jumping are affirmed.

FACTS AND PROCEDURAL BACKGROUND

On a winter night in February 2017, Dustin Hughes, then a patrol officer with the Colville Police Department, was following a car whose driver he suspected of driving under the influence. After observing two infractions, he conducted a traffic stop. He spoke to the driver, Joyce Hoffman, told her why she was stopped, and asked if she had been drinking. Ms. Hoffman said she had not, and Officer Hughes did not smell any alcohol. The officer noticed that Ms. Hoffman's pupils were constricted, which he knew from his drug training could indicate use of an opiate.

Officer Hughes took her information and on running it through dispatch learned she did not have a valid driver's license. He also requested a K-9 assist from the county sheriff's office. As he was obtaining Ms. Hoffman's information and preparing a

2

citation, a K-9 deputy arrived and walked his dog, Kilo, around Ms. Hoffman's car. Kilo alerted when he reached the passenger side door.

Officer Hughes delivered citations to Ms. Hoffman, told her of the K-9 alert, and asked if she would consent to a search of the car. She said the car belonged to her mother and she and her husband, who was her front seat passenger, had only borrowed it for the day.[2] She nonetheless consented to the search, but her husband objected.

Officer Hughes gave Ms. Hoffman permission to speak with her husband in an attempt to gain his consent and she spoke to him in hushed tones for about two minutes. When consent was not forthcoming, Officer Hughes decided to impound the car and apply for a search warrant. The car was towed to an evidence facility and secured.

After obtaining a warrant, Officer Hughes searched the car. He found a purse on the driver's side floorboard that contained documents belonging to Ms. Hoffman.[3] The purse also contained what Officer Hughes believed was a mints tin containing a crystal-like substance and a small green "baggie" emblazoned with dollar signs. Officer Hughes would testify at trial that such baggies are called "dime bag[s]" and "typically carr[y]

---

[2] This was consistent with the car's registration.
[3] At trial, Officer Hughes initially testified that the purse was found on the passenger floorboard, but he later testified, consistent with his contemporaneous report, that it was on the driver's side. He testified he believed that when Ms. Hoffman got out of the car during the traffic stop it was "closer to the seat . . . maybe under her legs." Report of Proceedings at 184.

3

narcotics." Report of Proceedings (RP) at 186. Officer Hughes did not see anything in the baggie, but it was tested anyway, with negative results.

In a console located between the car's front seats, Officer Hughes found a black nylon pouch containing hypodermic needles, a small cooking tin, cotton balls, unused cotton swab tips, and a butane torch. The cooking tin, which contained traces of brown matter, was later tested and found to contain a nonusable amount of heroin residue.

Ms. Hoffman was charged with one count of possession of heroin and one count of use of drug paraphernalia. Several months before trial, the State was granted leave to amend the information to add two counts of bail jumping for Ms. Hoffman's failure to appear for two pretrial hearings.

The case proceeded to a two-day jury trial in May 2019. During a break in jury selection, venire juror 4, Joshua Gavell, notified the bailiff that he had seen Ms. Hoffman in the hallway and heard her make incriminating statements on her phone. He was brought into the courtroom and outside the presence of the other members of the venire, was asked about what he heard. He answered,

> To quote, one of the things I heard was, "I should have been smart and thrown my drugs away." And the other thing was just comments about jurors that wouldn't be selected or not being worried about certain jurors that may be selected, because they had—were smart enough to put it on somebody else.

4

RP at 101. Mr. Gavell said he had not discussed what he heard with anyone but the bailiff. With the agreement of the parties, the trial court excused Mr. Gavell from the venire. The court later ruled, over a defense objection, that Mr. Gavell could be called as a witness by the State.

The State called as witnesses Officer Hughes, Mr. Gavell, a forensic scientist from the Washington State Patrol Crime Laboratory, the K-9 deputy, and court personnel who testified to Ms. Hoffman's failures to appear that were charged as bail jumping.

Officer Hughes testified consistent with the facts recounted above. When cross-examined, he testified that although he believed there was blood in the needles found in the heroin kit, they were not tested, so he did not know if the blood, if any, was Ms. Hoffman's. He testified he was not aware of any evidence that Ms. Hoffman used the needles or the cooking tin, other than that they were found in the car she was driving. He testified that he did not look to see if Ms. Hoffman's arms had track marks or blood spotting from recent needle use.

Defense counsel elicited the K-9 deputy's testimony that when Kilo alerted at the passenger side door of the car, Ms. Hoffman's husband was seated in the passenger seat.

Toward the end of the State's case, the prosecutor became aware that Ms. Hoffman might testify to reasons she had failed to appear on the two occasions that were the basis for the bail jumping charges. The prosecutor argued that if Ms. Hoffman

offered excuses, the court should instruct on the statutory "uncontrollable circumstances" affirmative defense to bail jumping. The defense requires the defendant to prove, by a preponderance of the evidence, that uncontrollable circumstances prevented her from appearing, she did not contribute to creating the circumstances in reckless disregard of the requirement to appear, and she appeared as soon as the circumstances ceased to exist.

The defense objected, arguing that it would not offer the evidence to excuse Ms. Hoffman's bail jumping. Defense counsel said he wished to offer the evidence to dispel any inference that Ms. Hoffman failed to appear because of consciousness of guilt of the drug offenses. The trial court reserved decision but warned the defense that if Ms. Hoffman offered reasons for her failure to appear, it believed the State would be entitled to the instruction.

In the defense case, Ms. Hoffman testified that she had been aware of and missed required court appearances on September 4 and December 31, 2018. As an excuse for failing to appear in September, she testified about a hospitalization that immediately preceded the September hearing date. She attributed her failure to appear in December to oversight. She testified that in the case of both missed appearances, she came to court and successfully moved for the bench warrants to be recalled. She did not offer testimony about the heroin residue or drug paraphernalia and the State did not question her about them in cross-examination.

6

Ms. Hoffman had submitted a proposed jury instruction on the defense of unwitting possession to the heroin possession charge. After she testified without disclaiming knowledge of the heroin residue, the prosecutor questioned whether the unwitting possession instruction should be given. Over a defense objection, the trial court agreed, stating the defense required affirmative proof and without it, the instruction would not be given. In light of Ms. Hoffman's testimony offering excuses for her failures to appear charged as bail jumping, the trial court instructed the jury on the uncontrollable circumstances affirmative defense.

The jury found Ms. Hoffman guilty as charged. She appeals.

## ANALYSIS

I.    MS. HOFFMAN IS NOT ENTITLED TO RETROACTIVE APPLICATION OF THE LEGISLATURE'S 2020 CHANGES TO THE ELEMENTS AND PENALTIES FOR BAIL JUMPING

Under former RCW 9A.76.170(1) (2001), which was in effect when Ms. Hoffman missed two required court appearances in 2018, her failure to appear constituted the crime of bail jumping. Her violations were classified as class C felonies and as seriousness level III offenses since she was held for, charged with, or convicted of a class C felony (her possession of heroin charge). Former RCW 9A.76.170(3)(c). Her bail jumping convictions were the convictions for which her longest sentences were imposed.

The elements, penalty, and seriousness level of bail jumping remained unchanged through the time of her trial and her sentencing.

In 2020, while Ms. Hoffman's appeal was pending, the legislature adopted Engrossed Substitute House Bill 2231, which narrowed the crime of bail jumping. Under the new law, the crime of bail jumping applies only (1) to persons who receive written notice of a required personal appearance *for trial* and fail to appear and (2) to certain failures to appear by persons who are held for, charged with, or convicted of a violent or sex offense. LAWS OF 2020, ch. 19, § 1.

For other failures to appear, the 2020 legislation created a new crime of "failure to appear or surrender," a lesser included offense of bail jumping. LAWS OF 2020, ch. 19, § 2 (codified at RCW 9A.76.190). A person fails to appear within the meaning of the new crime if he or she fails to appear after receiving written notice of the requirement of a subsequent personal appearance and either of the following apply:

- Within 30 days of the issuance of a warrant for failure to appear or surrender, the person did not move the court to quash it, and if a motion to quash was made, did not appear before the court with respect to the motion; or

- The person had a prior warrant issued based on a prior incident or failure to appear or surrender for the present cause for which he or she is being held or charged or has been convicted.

RCW 9A.76.190(1).[4]  The offense is a gross misdemeanor if the person was held for,

charged with, or convicted of a felony.  *Id.* at § 3.  It is a misdemeanor if the person was

held for, charged with, or convicted of a gross misdemeanor or misdemeanor.  *Id.*

Fortuitously, the State offered exhibits during Ms. Hoffman's trial that apparently

establish that the bench warrant for Ms. Hoffman's first failure to appear was quashed

within 30 days.  The exhibits are not in the record on appeal.[5]  Ms. Hoffman argues that if

the 2020 legislation applies retroactively, her nonappearance on September 4, 2018

would not constitute bail jumping or a criminal failure to appear, and her nonappearance

on December 31, 2018, while a criminal failure to appear, would be a gross

misdemeanor.  She offers two rationales why the 2020 legislation should apply

retroactively.  Both are unavailing.

> A.   First rationale: an alleged exception to the saving statute for legislation that is remedial or ameliorates a criminal penalty

Washington's general criminal savings statute, adopted in 1901, presumptively

saves all offenses already committed, and all penalties and forfeitures already incurred,

from being affected by the amendment or repeal of a criminal or penal statute.  *State v.*

---

[4] A slightly reworded uncontrollable circumstances affirmative defense remains available for both crimes.

[5] Ms. Hoffman's testimony suggested that she appeared at court an hour late for her required appearance in September.  The prosecutor explained to the court outside the presence of the jury that she wished to offer the order quashing the warrant to demonstrate that it was actually three weeks before Ms. Hoffman appeared.  The order quashing the September bench warrant was later offered and appears to have been admitted as exhibit 19 or 20.

*Kane*, 101 Wn. App. 607, 610, 5 P.3d 741 (2000). In the absence of a contrary

expression from the legislature, it requires that all crimes be prosecuted under the law

existing at the time of their commission. *State v. Lorenzy*, 59 Wash. 308, 309, 109 P.

1064 (1910). Addressing *amendment* of a criminal statute, it states:

> Whenever any criminal or penal statute shall be amended or repealed, all offenses committed or penalties or forfeitures incurred while it was in force shall be punished or enforced as if it were in force, notwithstanding such amendment or repeal, unless a contrary intention is expressly declared in the amendatory or repealing act, and every such amendatory or repealing statute shall be so construed as to save all criminal and penal proceedings, and proceedings to recover forfeitures, pending at the time of its enactment, unless a contrary intention is expressly declared therein.

LAWS OF 1901, Ex. Sess., ch. 6, § 1.

The statute departs from the common law, which regards a repealed statute as if it

never existed except as to matters past and closed; the common law would decide a

pending case "according to the . . . law 'at the time of the decision.'" *Kane*, 101 Wn.

App. at 611 (quoting *State v. Zornes*, 78 Wn.2d 9, 12, 475 P.2d 109 (1970) (plurality

opinion)).

The common law on this score is rejected more often than not. In 1938, our

Supreme Court observed that "[g]eneral savings clauses of the nature of that which we

have before us . . . have been enacted in virtually all of the states of the Union." *State v.

Hanlen*, 193 Wash. 494, 496, 76 P.2d 316 (citing 1 J.G. SUTHERLAND & JOHN LEWIS,

STATUTES & STATUTORY CONSTRUCTION, § 287, at 557 (2d ed. 1904)). A 2015 law

10

review article reports that only 6 of the 50 states do not have either a general saving

statute or a constitutional saving provision.  Eileen L. Morrison, *Resurrecting the*

*Amelioration Doctrine: A Call to Action for Courts and Legislatures*, 95 B.U. L. REV.

335, 344-45 (2015).[6]  Congress enacted its first general savings provision in 1871, and

the Washington Supreme Court described the federal savings clause in 1910 as "in all

essentials like" the Washington statute.  *State v. Hanover*, 55 Wash. 403, 407, 107 P. 388

(1910).

Criminal saving statutes "preserve[ ] a potential or pending prosecution from

being abated, perhaps inadvertently, by the Legislature's later act of repealing or

amending the substantive law defining the offense or fixing its penalty."  *Kane*, 101 Wn.

App. at 611; *see, accord Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 660,

94 S. Ct. 2532, 41 L. Ed. 2d 383 (1974) (explaining that the federal savings clause was

enacted to prevent abatements that were otherwise "often the product of legislative

inadvertence").  "Unless the later statutes clearly manifest a different intention,

[Washington's] general savings clause is deemed a part of every repealing statute as if

expressly inserted therein, and hence renders unnecessary the incorporation of an

---

[6] The article reports that "[t]he federal system and forty-one states have general saving statutes that apply to criminal laws; three additional states have general saving provisions written into their constitutions.  Only six states (Alabama, Delaware, Pennsylvania, Mississippi, North Carolina, and South Carolina) do not have general saving statutes."  Morrison, *supra*, at 344-45 (footnotes omitted).

individual saving clause in each statute which amends or repeals an existing penal

statute." *Hanlen*, 193 Wash. at 497.

> *The remedial nature of the 2020 legislation does not matter, because the*
> *criminal saving statute trumps the rule of statutory construction under*
> *which we apply remedial legislation retroactively*

One of Ms. Hoffman's arguments is that statutes that are remedial are construed to

apply retroactively. But in *Kane*, 101 Wn. App. 607, this court held that the remedial

nature of legislation does not make a difference when the criminal saving statute applies.

The Washington Supreme Court explicitly approved *Kane*'s reasoning on that score in

*State v. Ross*, 152 Wn.2d 220, 236-40, 95 P.3d 1225 (2004).

*Kane* involved a drug offender sentencing alternative (DOSA) imposed on a

defendant who, because he had a prior felony offense, was not eligible at the time of his

offense for the sentencing alternative. Before he was sentenced, the legislature amended

the eligibility requirements, making offenders with prior felony convictions eligible to be

considered for the alternative if the prior convictions were not for violent or sex offenses.

101 Wn. App. at 610. Kane was eligible for the alternative if the new statute applied to

him. *Id.* The trial court determined that he was eligible and imposed a DOSA. The State

appealed.

One of Kane's arguments on appeal was that the saving statute did not apply

because the intervening DOSA legislation was remedial. Kane was able to point to

legislative materials that described the remedial concerns that prompted the DOSA

amendments.

This court recognized in *Kane* that under common law, the remedial nature of the

DOSA amendments would generally matter in construing *those amendments*. But when

the saving statute applies, its express requirements are controlling, and it contains no

exception for remedial legislation. As the court explained,

> [L]egislative history materials cannot make up for the lack of words in the
> . . . statute itself. Therefore, while the bill reports do manifest a legislative
> purpose to increase, in various ways, intervention and treatment for
> offenders addicted to drugs, we must conclude that the intent of the
> Legislature is to accomplish that purpose only with respect to defendants
> who offend after its effective date.

*Id.* at 614-15. *Kane* identified the trial court's error as its failure to "recognize the saving

statute . . . as controlling." *Id.* at 615. It properly held that "[w]hen a new statute repeals

or amends a statute governed by the saving statute, it will be given prospective

application *even if it is patently remedial*, unless it contains words that fairly convey a

different intention." *Id.* (emphasis added).

> *We need not decide whether legislation that ameliorates a criminal penalty should
> be presumed retroactive, because even case law on which Ms. Hoffman relies
> disfavors retroactive application that requires second trials*

In two decisions relied on by Ms. Hoffman, our high court has invoked a view that

legislation that ameliorates a criminal penalty should apply retroactively notwithstanding

13

a criminal saving statute. Before turning to the two Washington cases, we provide a broader perspective on that view.

The Boston University Law Review article cited above identifies nine states as of 2015 whose legislatures have adopted explicit exceptions to their saving statutes for legislation that ameliorates a criminal penalty. Morrison, *supra*, at 346 & n.73. Illinois's statute, which the article's author describes as representative, provides in part that "[i]f any penalty, forfeiture or punishment be mitigated by any provisions of a new law, such provision may, by the consent of the party affected, be applied to any judgment pronounced after the new law takes effect." *Id.* at 346 (citing 5 ILL. COMP. STAT. 70/4 (2013)). The law review author characterizes these legislatively established exceptions as "express[ing] strong legislative desires for ease of application; ameliorative changes apply only to defendants who have not yet been sentenced." *Id.* Second trials or resentencing can thereby be avoided.

The article identifies only four states that, as of 2015, have judicially recognized exceptions to their saving provisions for legislation that ameliorates criminal penalties. *Id.* at 349-52. The first was New York, in *People v. Oliver*, 1 N.Y.2d 152, 151 N.Y.S.2d 367, 134 N.E.2d 197 (1956), followed by California, in *In re Estrada*, 63 Cal. 2d 740, 48 Cal. Rptr. 172, 408 P.2d 948 (1965)). Minnesota (in 1979) and Michigan (in 1990) are the two others. Morrison, *supra*, at 351-52, nn.109 & 113.

14

The first of the two Washington decisions on which Ms. Hoffman relies for retroactive application of the 2020 bail jumping charges, *State v. Heath*, 85 Wn.2d 196, 198, 532 P.2d 621 (1975), cited *Oliver* and *Estrada*. In *Heath*, the Washington Supreme Court held that a legislative change permitting courts to stay the revocation of a habitual traffic offender's driver's license operated retroactively. The change was to civil, not criminal law, and the criminal saving statute is not mentioned in the opinion. As one reason for applying the change retroactively, however, the court observed that it "in effect, reduced the penalty for a crime." *Id.* at 198. *Heath* observed that "[w]hen this is so, the legislature is presumed to have determined that the new penalty is adequate." The authority it cited was *Oliver* and *Estrada*. *Id.*

The second Washington decision Ms. Hoffman relies on is *State v. Wiley*, 124 Wn.2d 679, 880 P.2d 983 (1994). The Supreme Court characterized the issue before it in *Wiley* as being, "When does a change in law apply retroactively to the prior convictions used to calculate an offender score under the [the Sentencing Reform Act of 198, chapter 9.94A RCW (SRA)]?" *Id.* at 682. Citing *Heath*, the Supreme Court stated in *Wiley* that when the legislature downgrades the status of an offense, a sentencing court must give retroactive effect to the legislative action, because "when the Legislature downgrades an entire crime, it has judged the specific criminal conduct less culpable." *Id.* at 687. Such a downgrade reflects a "fundamental reappraisal of the value of punishment" that is

15

"highly relevant to a sentencing judge's estimation of a defendant's overall culpability and dangerousness." *Id.* at 687-88.

In *Kane*, this court rejected the exception for ameliorative legislation recognized by the New York and California courts in *Oliver* and *Estrada*, explaining that "[w]hile the sentiments expressed in *Oliver* are not irrational, they are insufficiently deferential to the legislative intent expressed by our saving statute." 101 Wn. App. at 617. It explained why the reasoning of the D.C. Court of Appeals in *Holiday v. United States*, 683 A.2d 61 (1996), *cert. denied*, 520 U.S. 1162, 117 S. Ct. 1349, 137 L. Ed. 2d 506 (1997), was more persuasive. *Id.*

While the Supreme Court in *Ross* had cited *Kane* with approval on the issue of remedial legislation, *Ross* can be read as equivocal on the retroactive application of ameliorative legislation. On the one hand, the court said in *Ross*, "[W]e refuse to extend . . . language in *Heath* to cases where the savings clause clearly requires this court to enforce statutory amendments to the penal code prospectively." 152 Wn.2d at 239 n.11. In the next breath, however, it suggested that the legislative amendments presented in *Ross* were distinguishable from the type of amendment discussed in *Wiley*. *Id.* at 240 ("[T]he amendments in this case do not reflect a legislative determination that the offenses are less culpable.").

16

In deciding *Jenks*, Division Two of this court rejected arguments that *Heath* and *Wiley* support retroactive application of ameliorative amendments. *Jenks* reviewed a life without release sentence imposed on Alan Jenks as a persistent offender in 2017. On appeal, Jenks argued that the court should apply changes made in 2019 to the Persistent Offender Accountability Act[7] that eliminated second degree robbery—Jenks's first "strike"—as a "most serious offense." 12 Wn. App. 2d at 589-90. Like the Supreme Court in *Ross*, the *Jenks* court pointed out that neither *Wiley* nor *Heath* analyzed the application of the saving statute. *Id.* at 595-97. *Jenks* also attached significance to the legislature's enactment in 2000 of RCW 9.94A.345, which states that "[a]ny sentence imposed under [the SRA] shall be determined in accordance with the law in effect when the current offense was committed." LAWS OF 2000, ch. 26, § 2. Division One agreed with *Jenks*'s holding on this score in *State v. Molia*, 12 Wn. App. 2d 895, 903-04, 460 P.3d 1086 (2020).

We need not predict how our Supreme Court will rule in *Jenks*. This case presents more than a pure amelioration of a criminal penalty. It presents an amendment that changes the elements of a crime—a complicating factor that triggers the need for second trials.

California case law under its *Estrada* rule is illustrative. The *Estrada* rule provides that "where the amendatory statute mitigates punishment and there is no saving

---

[7] RCW 9.94A.570.

17

clause, the rule is that the amendment will operate retroactively so that the lighter

punishment is imposed." *Estrada*, 63 Cal. 2d at 748. California cases have held that the

rule applies to legislation that changes elements of a crime or a sentencing enhancement

in a manner that might reduce or foreclose punishment. In *People v. Figueroa*, 20 Cal.

App. 4th 65, 69-70, 24 Cal. Rptr. 2d 368 (1993), for instance, a prosecution for a

controlled substance violation, the State proved the elements of a three-year "drug

trafficking near schoolyards" enhancement at trial. During the pendency of the appeal,

the enhancement statute was amended to require proof of an additional element: that

school be in session or that minors be using the facility when the offense occurs. The

appellate court agreed that under the *Estrada* rule, Figueroa had to be given the benefit of

the amended statute.

> As for *how* to give him the benefit of the amended statute, the court explained:

> To say that appellant is now free of the enhancement would be to reward
> him with a windfall. The People are entitled to an opportunity to prove
> beyond a reasonable doubt that, when the crime was committed, the school
> was in session or was being used by minors. We shall remand the case for
> that purpose.

20 Cal. App. 4th at 71.[8] The court rejected any suggestion that remand would violate

protections against ex post facto legislation, because it was Figueroa who was asking for

---

[8] See also *People v. Eagle*, 246 Cal. App. 4th 275, 280, 200 Cal. Rptr. 3d 773
(2016), which held that even if there were a lesser included offense, the appellate court
could not reduce the conviction to that offense because the State must be given the
opportunity to prove the additional element of the greater offense.

the legislation to be applied retrospectively. The parties agreed that no double jeopardy issue was presented by a further trial because the issue of whether school was in session or minors were using the facility was never tried.

Here, for defendants appealing convictions for bail jumping when the 2020 changes became effective, the State would not have been required to prove at trial that they failed to appear for trial, or that they met the elements that constitute bail jumping by persons facing a charge of a violent offense or sex offense. If Washington were to judicially recognize the exception recognized in *Estrada*, the State would have to be given the opportunity to prove the newly required elements in a second minitrial. It would presumably have to be given the opportunity to prove the elements of criminal failure to appear.

In *Wiley*, the Supreme Court affirmatively rejected the retroactive application of legislation that changes elements of a crime and results in the need for second trials. *E.g.*, 124 Wn.2d at 686 (balking at a rule that would "create mini-trials over prior convictions" because a change in elements "requires the State or defendant to prove an offense under current law"); *id.* at 688 ("[A] change in elements does not affect prior convictions under the SRA."). Ms. Hoffman cites to no reported Washington case that suggests a different view. *Wiley* is controlling precedent on this score.

It is no response that evidence fortuitously presented at Ms. Hoffman's trial suggests that her first failure to appear would not be a crime under the 2020 legislation and her second failure to appear would be a gross misdemeanor. The question presented on appeal—a legal question—is whether the 2020 changes to the bail jumping statute *categorically* apply retroactively. Because retroactive application of the 2020 changes would result in the need for second trials, *Wiley* compels the conclusion that they do not apply retroactively.

B.      Second rationale: prospective application under judicial default rules addressed in *Ramirez*

Alternatively, citing *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018), Ms. Hoffman argues that we can apply the 2020 amendments *prospectively*, by treating the law, as amended, as the rule of decision on appeal.

Our Supreme Court closely examined whether legislation is fairly characterized as applying prospectively rather than retroactively in *State v. Pillatos*[9] and *In re Personal Restraint of Flint*,[10] and in both cases, relied on the United States Supreme Court's close examination of the same question in *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994). In both *Pillatos* and *Flint*, the court quoted with approval Justice Stevens's statement that determining whether a statute operates prospectively or retroactively is to

---

[9] 159 Wn.2d 459, 471, 150 P.3d 1130 (2007).
[10] 174 Wn.2d 539, 547-48, 277 P.3d 657 (2012).

> "'ask whether the new provision attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates "retroactively" comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.'"

*Flint*, 174 Wn.2d at 548 (quoting *Pillatos*, 159 Wn.2d at 471 (quoting, in turn, *Landsgraf*, 511 U.S. at 269-70)).

*Landsgraf* involved a civil suit alleging a hostile work environment, and the plaintiff's argument for retroactive application of remedies made available under the Civil Rights Act of 1991. 511 U.S. at 248-49. The federal criminal saving statute had no application and was not discussed.

As *Landsgraf* explained, courts do not engage in the judicial analysis of whether a statute's application is retroactive if the legislature's intent is clear. Justice Stevens identified "the court's first task" as being "to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules." *Id.* at 280. There is no need to resort to judicial default rules when a criminal saving statute applies and "saves" from repeal or amendment offenses previously committed and penalties or forfeitures earlier incurred. As earlier noted, the saving statute "is deemed a part of every repealing statute as if expressly inserted therein." *Hanlen*, 193 Wash. at 497.

21

Our Supreme Court recognized this in *Pillatos*. In deciding it was able to address

whether *Blakely*-fix legislation[11] could operate prospectively notwithstanding the saving

statute, the court relied on the fact that the saving statute applies only to substantive

changes in the law, not procedural ones. 159 Wn.2d at 472 ("Since at least the relevant

portions of Laws of 2005, chapter 68 are merely procedural, RCW 10.01.040 does not bar

their application.").

*Ramirez* did not address RCW 10.01.040. Presumably, no one argued it applied.

The Supreme Court had earlier held in *State v. Blank* that legislation allowing appellate

costs on convicted indigent defendants was procedural, not substantive. 131 Wn.2d 230,

250-51, 930 P.2d 1213 (1997). And this court had previously held that the saving statute

does not apply to legal financial obligations, which have historically not been regarded as

punishment. *State v. Brewster*, 152 Wn. App. 856, 861, 218 P.3d 249 (2009); *State v.*

*Thompson*, 153 Wn. App. 325, 337, 223 P.3d 1165 (2009).

RCW 10.01.040 *does* apply to the legislature's 2020 amendments to the bail

jumping statute. And substantive criminal liability is, of course, not procedural. It is

precisely what the terms "penalty" and "forfeiture" mean when used in a saving statute.

*Brewster*, 152 Wn. App. at 859 (The terms "penalty," "liability," and "forfeiture" as used

---

[11] Laws of 2005, chapter 68, section 1, which added a new procedure for juries to find facts justifying exceptional sentences, bringing the SRA into accord with the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). *Pillatos*, 159 Wn.2d at 468.

in the federal general saving statute are synonymous with "punishment" and therefore the terms include all forms of punishment for a crime, both ameliorative and harsher.) (citing *Marrero*, 417 U.S. at 660) (internal quotation marks omitted).

When the criminal saving statute applies, the analysis undertaken in *Ramirez* does not.

We reverse Ms. Hoffman's convictions for possession of a controlled substance and use of drug paraphernalia and remand for resentencing. Her convictions for bail jumping are affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

II.    REFUSAL TO INSTRUCT ON UNWITTING POSSESSION

Ms. Hoffman contends the court erred when it denied her request that the jury be instructed on the "unwitting possession" defense to the possession of heroin charge.

We reject the State's threshold argument that any error was unpreserved. The defense requested the instruction before trial. After Ms. Hoffman testified and the State asked the court not to give the instruction because she had not disclaimed knowledge of the heroin residue, defense counsel responded, "Judge, there is no testimony from my

client to that effect, but there are no admissions from my client, so I would ask

(inaudible)." RP at 296. Though part of the statement was not audible, it is clear the

defense stood by its position that the instruction should be given.

Unlawful possession of a controlled substance is a strict liability crime that

requires the State to prove the nature of the substance and the fact of possession. *State v.*

*Bradshaw*, 152 Wn.2d 528, 538, 98 P.3d 1190 (2004), *cert. denied*, 544 U.S. 922 (2005).

The State does not have to prove knowledge. *Id.* A defendant may raise the affirmative

defense that possession was unwitting, however. *State v. Deer*, 175 Wn.2d 725, 735, 287

P.3d 539 (2012), *cert. denied*, 568 U.S. 1148 (2013). "To prove unwitting possession, a

defendant must show by a preponderance of the evidence that she did not know that the

substance was in her possession or did not know the nature of the substance." *State v.*

*Sandoval*, 8 Wn. App. 2d 267, 281, 438 P.3d 165, *review denied*, 193 Wn.2d 1028

(2019).

When deciding whether to give the instruction, a court must view the evidence in

the light most favorable to the defendant. *State v. Fisher*, 185 Wn.2d 836, 849, 374 P.3d

1185 (2016). A defendant is entitled to the benefit of all of the evidence and may even

rely on facts inconsistent with her own testimony to justify an affirmative defense. *Id.*

This court held in *State v. George*, 146 Wn. App. 906, 915, 193 P.3d 693 (2008),

that it was error for the trial court to refuse to instruct on unwitting possession on the

24

basis that the defendant did not testify, where a testifying trooper provided evidence from which the defense could argue unwitting possession. The trooper testified to the number of people who were in the vehicle in which the controlled substance was found, that all denied knowledge of the controlled substance, and that George was not the vehicle's owner.

Officer Hughes did not testify in the trial below that Ms. Hoffman denied knowledge of the residue, but the defendant's denial of knowledge was not the deciding factor in *George.* What mattered was that there was *some* evidence supporting an unwitting possession defense. Here, evidence weighing in favor of the defense were the facts that the car belonged to Ms. Hoffman's mother and Ms. Hoffman had been using it only for the day; the drug residue was in the center console, out of plain sight; even if Ms. Hoffman had looked inside the console, the paraphernalia in which the residue was found was in a closed pouch; and—the fact most emphasized by defense counsel—Ms. Hoffman consented to a search of the car. In addition, the console was equally accessible to Ms. Hoffman's husband; he was the one who refused to consent to a search; and Kilo alerted at his passenger door. Ms. Hoffman's constricted pupils, venire juror Gavell's testimony about what he overheard, and arguably the dime bag in Ms. Hoffman's purse were evidence cutting against the defense, but that evidence did not justify refusing to give the instruction.

The conviction for heroin possession is reversed and remanded for a new trial.

III.    IF THE TRIAL COURT ERRED BY INSTRUCTING THE JURY ON UNCONTROLLABLE CIRCUMSTANCES OVER MS. HOFFMAN'S OBJECTION, THE ERROR WAS HARMLESS

After defense counsel apparently prevailed in arguing that Ms. Hoffman should be allowed to explain her failures to appear charged as bail jumping without asserting the defense of uncontrollable circumstances, the State asked the court to instruct on the defense anyway, to avoid jury confusion. The trial court initially gave defense counsel a choice: if Ms. Hoffman wanted to testify to her excuses for failing to appear, she could, but the court would give the instruction; otherwise, her excuses were irrelevant.

In support of its request for instruction, the State cited Division Two's 2009 unpublished decision in *State v. Yeates*, noted at 152 Wn. App. 1010, 2009 WL 2873774.[12] *Yeates* held that when the defendant offered excuses to bail jumping charges that fell short of a legally sufficient affirmative defense, the trial court did not err by instructing on the proof required for the uncontrollable circumstances defense over Yeates's objection. The court explained that "[t]he trial court did not impose an affirmative defense on Yeates; rather, it clarified any potential confusion the jury may have had regarding the legal sufficiency of the defense Yeates chose to present." *Id.* at *4.

---

[12] Unpublished decisions have no precedential value, are not binding on any court, and may be cited only for such persuasive value as the court deems appropriate. *See* GR 14.1.

After reviewing *Yeates*, the trial court said it would reserve its ruling on whether to instruct on the affirmative defense until it heard Ms. Hoffman's testimony. It warned the defense that if Ms. Hoffman offered excuses for not appearing, it believed the State would be entitled to the instruction.

Ms. Hoffman argues that the trial court's giving the instruction violated her right to control her defense. The right of a criminal defendant to control her defense is "[i]mplicit in the Sixth Amendment." *State v. Lynch*, 178 Wn.2d 487, 491, 309 P.3d 482 (2013). It is well settled that the right is violated if a trial court instructs on a defense that the defendant does not wish to present. *State v. Coristine*, 177 Wn.2d 370, 378, 300 P.3d 400 (2013). As the Supreme Court explained in *Coristine*,

> An affirmative defense places a burden of proof on the defendant, thus shaping the defense by introducing elements it must prove. This process may influence a wide range of strategic trial decisions, such as who is called to testify, the questions asked on direct- and cross-examination, and what arguments are made in summation.

*Id.*

The dilemma for the trial court in this case, and for the trial court in *Yeates*, is a defendant who presents evidence that *looks* like a defense and that the jury *might perceive* as a defense, but who does not want the jury instructed on the burden of proof that goes along with the defense. The trial court reasonably questioned the relevance of Ms. Hoffman's excuses if they were not being offered to defend her failure to appear.

27

Excluding her excuses on relevance grounds would have been a safer course than the constitutionally fraught course of instructing on an affirmative defense over a defendant's objection.

Even applying the constitutional harmless error standard, however, we find that any error in giving the instruction over Ms. Hoffman's objection was harmless. When a trial court violates a defendant's right to control her defense, "prejudice is presumed and the State bears the burden of proving [the error] was harmless beyond a reasonable doubt." *Id.* at 380.

It is clear beyond a reasonable doubt that the jury would have convicted Ms. Hoffman of the bail jumping charges without the affirmative defense instruction. The State was required to prove Ms. Hoffman knew that she was required to appear and failed to do so. In addition to testimony from court clerks establishing these facts, Ms. Hoffman admitted them herself. Reversal is not required.

IV.    RIGHT TO A UNANIMOUS JURY VERDICT

Finally, challenging her conviction for use of drug paraphernalia, Ms. Hoffman argues that her right to a unanimous jury verdict was violated because the State failed to elect one of multiple possible violations and no unanimity instruction was given.

A jury must unanimously agree on the act that supports a conviction. *State v. Petrich*, 101 Wn.2d 566, 569, 683 P.2d 173 (1984); *State v. Kitchen*, 110 Wn.2d 403,

28

411, 756 P.2d 105 (1988). Where multiple acts could constitute the crime charged, the State must either elect which act it will rely on for conviction or the trial court must give a unanimity, or *Petrich*, instruction informing the jury that it must agree on the same criminal act. *State v. Vander Houwen*, 163 Wn.2d 25, 38, 177 P.3d 93 (2008); *Kitchen*, 110 Wn.2d at 409. Failure to do so is constitutional error because of "the possibility that some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." *Id.* A failure to give a unanimity instruction where one is required may be raised for the first time on appeal because it is manifest constitutional error. *State v. Kiser*, 87 Wn. App. 126, 129, 940 P.2d 308 (1997).

The State responds that unanimity is not a problem because its evidence was of a continuing course of conduct. A case involving separate acts that amount to a continuing course of conduct is not a "multiple acts" case. *State v. McNearney*, 193 Wn. App. 136, 141, 373 P.3d 265 (2016).

To determine whether multiple acts form one continuing offense, courts must view the facts in a common sense manner. *Petrich*, 101 Wn.2d at 571. Evidence that multiple acts were intended to secure the same objective supports a finding that the defendant's conduct was a continuing course of conduct. *State v. Handran*, 113 Wn.2d 11, 17, 775

29

P.2d 453 (1989).  Courts also consider whether the conduct occurred at different times and places or against different victims.  *Petrich*, 101 Wn.2d at 571.

Most importantly here, courts consider whether the nature of the evidence differs for the separate acts, such that a rational juror could entertain reasonable doubt as to whether one or more of them actually occurred.  *Kitchen*, 110 Wn.2d at 412.  Ms. Hoffman likens her case to *State v. King*, 75 Wn. App. 899, 878 P.2d 466 (1994), in which the defendant was charged with a single count of possession of a controlled substance for two pieces of rock cocaine found near or on his person after a traffic stop. The first was found in a medicine container that police located on the floor between the driver's seat and the front passenger seat, in which King had been sitting.  *Id.* at 901.  The second was allegedly found during an inventory search at the police station, in a fanny pack King had with him in the car.  *Id.*  King denied that the medicine container on the floor was his and testified that the cocaine must have been planted in his fanny pack by police.  *Id.* at 904.  Because there was conflicting evidence as to both alleged acts of possession and one alleged possession was constructive while the other was actual, the court could not say that the jury acted with unanimity as to one act of possession.  *Id.* at 903-04.

The same is true here.  For the dime bag found in the purse, which had been under Ms. Hoffman's legs on the driver's side floor, the evidence of actual possession was

strong. But evidence of "use" of the dime bag was weak, at best. "[M]ere possession of drug paraphernalia is not a crime" under RCW 69.50.412(1). *State v. McKenna*, 91 Wn. App. 554, 563, 958 P.2d 1017 (1998). By contrast, evidence of someone's use of the paraphernalia found in the center console was strong, but a rational juror could have had a reasonable doubt whether Ms. Hoffman used it.

The lack of a unanimity instruction or election was error and was not harmless beyond a reasonable doubt.

We reverse Ms. Hoffman's convictions for possession of a controlled substance and use of drug paraphernalia and remand for resentencing.[13] Her convictions for bail jumping are affirmed.

_____
Siddoway, J.

WE CONCUR:


_____                    _____
Pennell, C.J.                                       Fearing, J.

---

[13] Ms. Hoffman's challenge to the imposition of supervision costs, if not moot, can be raised at resentencing.